**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LARRY MORRISON,

               Plaintiff,                            Case No.:  1:16-cv-03351-RA

     – against –

EMINENCE CAPITAL, LLC; EMINENCE
GP, LLC; RICKY C. SANDLER; EMINENCE
PARTNERS, L.P., EMINENCE PARTNERS II,
L.P.; EMINENCE PARTNERS LEVERAGED,
L.P.; EMINENCE EAGLEWOOD MASTER, L.P.;
EMINENCE PARTNERS LONG, L.P.;
EMINENCE FUND MASTER, LTD.; EMINENCE
FUND LEVERAGED MASTER, LTD.;
EMINENCE FUND LONG, LTD.; JOHN DOE; and
TAILORED BRANDS, INC.

               Defendants.

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND <u>STRIKE PORTIONS OF THE AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

SUMMARY OF FACTS ......................................................................................2

Plaintiff ........................................................................................................2

Men's Wearhouse, Tailored Brands and the Reorganization ............................3

Eminence.......................................................................................................4

Eminence Successfully Pushes for a Merger Between the Company and JOSB ............4

Eminence Becomes a 10% Beneficial Owner of Men's Wearhouse Common Stock Through Open Market Purchases ..........................................................................5

Eminence Also Becomes a 10% Beneficial Owner of Men's Wearhouse Common Stock Through Its Membership in a Group with Board Members ............................5

Eminence Profited from Short-Swing Trading...................................................6

ARGUMENT ..................................................................................................6

I.      PLAINTIFF PLAUSIBLY ALLEGED THAT EMINENCE BENEFICIALLY OWNED 10% OR MORE OF THE COMPANY'S COMMON STOCK WHILE ENGAGING IN SHORT-SWING TRADING.......................................7

      A.  Plaintiff Plausibly Alleged that Eminence Beneficially Owned 10% or More of the Common Stock................................................................8

      B.  Plaintiff Plausibly Alleged that Eminence Was a Member of a Section 13(d) Group, Beneficially Owning 10% or More of the Common Stock........10

            1.  Plaintiff Has Plausibly Alleged that Eminence Combined in Furtherance of a Common Objective with Members of the Board...........11

            2.  Plaintiff Has Plausibly Alleged that One of the Common Objectives of the Group Related to the Voting of the Company's Common Stock ....15

II.     PLAINTIFF HAS STANDING TO ASSERT THE SECTION 16(b) CLAIMS ASSERTED IN THIS ACTION ........................................................17

      A.  Plaintiff Has Standing to Pursue Section 16(b) Claims Because TBI Is a Successor Issuer to Men's Wearhouse.......................................18

C.  Rule 414(b) Required TBI to Assume Ownership of the Section 16(b) Claim ................................................................................20

C.  The Reorganization Can Also Be Disregarded for Purposes of This Action Because of TBI's Failure to Comply with Rule 414......................................22

III.  ALLEGATIONS CONCERNING THE REORGANIZATION'S TIMING BEING FRAUDULENTLY MOTIVATED BY EMINENCE'S DESIRE TO AVOID SECTION 16(b) LIABILITY SHOULD NOT BE STRICKEN .............23

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
    684 F.3d 36 (2d Cir. 2012)........................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................6, 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................................6

*Blau v. Oppenheim*,
    250 F. Supp. 881 (S.D.N.Y. 1966) ......................................................................18

*Christensen v. Harris County*,
    529 U.S. 576 (2000)..............................................................................................20

*Donoghue v. Bulldog Inv'rs Gen. P'ship*,
    696 F.3d 170 (2d Cir. 2012)...................................................................................7

*Dreiling v. Am. Online, Inc.*,
    578 F.3d 995 (9th Cir. 2009) ........................................................................... 11-12

*Facebook, Inc. v. Morgan Stanley & Co. LLC*,
    986 F. Supp. 2d 544 (S.D.N.Y. 2014)............................................................. 13-14

*Feder ex rel. Ivax Corp. v. Frost*,
    220 F.3d 29 (2d Cir. 1998)................................................................................7, 15

*Foman v. Davis*,
    371 U.S. 178 (1962)..............................................................................................23

*Goldstein v. QVT Assocs. GP LC*,
    No. 10 Civ. 2488 (HB), 2010 U.S. Dist. LEXIS 109973 (S.D.N.Y. Oct. 15, 2010) .........15

*Heine ex rel. Computer Assocs Int'l, Inc. v. Soros*,
    No. 93 Civ. 9027 (LMM), 1994 U.S. Dist. LEXIS 15812 (S.D.N.Y. Nov. 3, 1994) ........19

*Howard v. SEC*,
    376 F.3d 1136 (D.C. Cir. 2004) ..........................................................................12

*In re Bennett Funding Group, Inc.*,
    336 F.3d 94 (2d Cir. 2003)...................................................................................10

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  No. 14-3800 (2d Cir.)................................................................................................14

*iXL Enters. v. GE Capital Corp.*,
  167 Fed. Appx. 824 (2d Cir. 2006)............................................................................20

*Johnson v. City of Shelby*,
  No. 13-1318, 2014 U.S. LEXIS 7437 (Nov. 10, 2014) ..................................................23

*Mendell ex. rel. Viacom, Inc. v. Gollust*,
  909 F.2d 724 (2d Cir. 1990), *aff'd on other grounds,* 561 U.S. 115 (1991).......... 18-19, 20

*Morales v. Freund*,
  163 F.3d 763 (2d Cir. 1999)......................................................................................16

*Morales v. New Valley Corp.*,
  999 F. Supp. 470 (S.D.N.Y. 1998) .......................................................................16, 17

*Morales v. Quintel Entm't, Inc.*,
  249 F.3d 115 (2d Cir. 2001).............................................................................8, 10, 13

*N.Y.C. Emples. Ret. Sys. v. SEC*,
  45 F.3d 7 (2d Cir. 1995)...........................................................................................22

*Pepper v. Litton*,
  308 U.S. 295 (1939)..................................................................................................20

*Pinter v. Dahl,*
   486 U.S. 622 (1988)................................................................................................23

*Republic of Iraq v. ABB AG,*
  768 F.3d 145 (2d Cir. N.Y. 2014)..............................................................................10

*Roth v. Jennings,*
  489 F.3d 499 (2d Cir. 2007)................................................................ 7, 10-11, 15, 16

*Schaffer, ex rel. Lasersight Inc. v. CC Invs., LDC,*
  No. 99 Civ. 2821 (VM), 2002 U.S. Dist. LEXIS 24511 (S.D.N.Y. Dec. 19, 2002)..........16

*SEC v. Bilzerian,*
  29 F.3d 689 (D.C. Cir. 1994) .....................................................................................8

*SEC v. Drexel Burnham Lambert, Inc.*,
  837 F. Supp. 587 (S.D.N.Y. 1993) ..............................................................................8

iv

*SEC v. Savoy Indus., Inc.*,
   587 F.2d 1149 (D.C. Cir. 1978) ................................................................12

*Sisak v. Wings and Wheels Express, Inc.*,
   70 Civ. 2817 U.S. Dist. LEXIS 10313 (S.D.N.Y. 1970) ............................ 16-17

*Tze Wung Consultants, Ltd. v. Bank of Aroda (In re Indu Craft, Inc.)*,
   749 F.3d 107 (2d Cir. 2014) ................................................................19

*Untermeyer v. Valhi, Inc.*,
   665 F. Supp. 297 (S.D.N.Y. 1987), *aff'd,* 841 F.2d 25 (2d Cir. 1988) ................18, 19, 20

*U.S. v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ................................................................8

*Wellman v. Dickinson*,
   682 F.2d 355 (2d Cir. 1982) ................................................................11

*Williams v. Citigroup, Inc.*,
   659 F.3d 208 (2d Cir. 2011) ................................................................23

**Statutes and Rules**

15 U.S.C. § 77e(a) (2016) ................................................................23

15 U.S.C. § 78c(a)(8) (2016) ................................................................19

15 U.S.C. § 78m(d)(3) (2016) ................................................................10, 15

15 U.S.C. § 78p(b) (2016) ................................................................15, 24

15 U.S.C. § 77l(a) (2016) ................................................................23

Fed. R. Civ. P. 15(a)(2) ................................................................23

Fed. R. Evid. 902(11) ................................................................9

Fed. R. Evid. 1006 ................................................................9

17 C.F.R. § 230.414 (2016) ................................................................ *passim*

17 C.F.R. § 230.414(b) (2016) ................................................................20, 21, 22

17 C.F.R. § 230.414(c) (2016) ................................................................3, 22, 23, 24

17 C.F.R. § 240.13d-3(b) (2016) .......................................................................8

17 C.F.R. § 240.13d-5(b)(1) (2016)............................................................. 10-11

17 C.F.R. § 240.16a-1(a)(1) (2016) ................................................................8

8 *Del. C.* § 251(g) (2016).............................................................................21

Tex. Bus. Orgs. Code § 10.005 (2015) ..........................................................21

Tex. Bus. Orgs. Code § 21.401 (2015) ..........................................................13

**Other Authority**

*Bilzerian*, Exchange Act Release No. 12144, 1989 SEC LEXIS 1208 (June 29, 1989) ................8

M. Farrell, *Activist Hedge Fund Criticizes Jos. A. Bank for Eddie Bauer Deal*,
Wall St. J. L. Blog (Feb. 18, 2014).........................................................................5

Financial Industry Regulatory Authority, http://www.finra.org/industry/adf .............................10

*Monster Beverage Corp. & New Laser Corp.*, SEC No-Action Letter,
2015 SEC No-Act. LEXIS 377 (June 12, 2015) ........................................................21

Plaintiff Larry Morrison ("Plaintiff"), by his undersigned counsel, respectfully submits this memorandum of law in opposition to the motion to dismiss filed by defendants Eminence Capital, L.P. (as successor to Eminence Capital, LLC); Eminence GP, LLC; Ricky C. Sandler; Eminence Partners, L.P.; Eminence Partners II, L.P.; Eminence Partners Leveraged, L.P.; Eminence Eaglewood Master, L.P.; Eminence Partners Long, L.P.; Eminence Fund Master, Ltd.; Eminence Fund Leveraged Master, Ltd.; and Eminence Fund Long, Ltd. (collectively, "Eminence" or the "Defendants") (ECF Nos. 14-16) which was joined in by nominal defendant Tailored Brands, Inc. ("TBI" or "Tailored Brands") (ECF. Nos. 20-21).

## PRELIMINARY STATEMENT

Eminence earned more than $17 million through short-swing insider trading in the common stock of The Men's Wearhouse, Inc. ("Men's Wearhouse" or the "Company"). Specifically, at a time Eminence beneficially owned more than 10% of the common stock, it purchased the Company's stock for an average price of $41.88 per share and then sold shares less than six months later for as much as $58.29 per share, or an approximately 40% gain.

Eminence's status as a 10% beneficial owner came from two sources. The first involved open market purchases which, although reported as a single transaction, in fact, took place in a series of smaller transactions either directly by or through an agent acting on behalf of Eminence. Defendants also became a 10% beneficial owner of the Company's common stock through joining together with members of the Company's board of directors (the "Board") with respect to voting the Company's stock. The voting agreement was a critical linchpin of an arrangement which allowed Eminence to earn an immediate profit by the Company increasing its tender offer price for the stock of Jos. A. Bank Clothiers, Inc. ("JOSB"), with the Board members earning increased compensation in the future and being able to retain their positions as Board members

through Eminence's agreement on voting.  This created a group within the meaning of Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act") which provides the governing definition for determining whether a person is a beneficial owner of securities within the meaning of Section 16(b) of the Exchange Act.

Defendants fare no better in arguing that Plaintiff was deprived of standing to pursue his Section 16(b) claims because of a corporate reorganization (the "Reorganization") in which Tailored Brands became the holding company of Men's Wearhouse.  The Reorganization was rushed through prior to obtaining a necessary shareholder vote and immediately before Plaintiff would have been free to commence his Section 16(b) lawsuit, which would have obviated any issue relating to Plaintiff's standing to pursue these claims.

However, Plaintiff retains standing to pursue his claims because Rule 414 promulgated by the Securities and Exchange Commission ("SEC") pursuant to the Securities Act of 1933 (the "Securities Act") provides that TBI is, as a matter of law, a successor issuer of the Company.  In addition, Rule 414 required that TBI, as part of the Reorganization, assume the ownership of the Section 16(b) claims in this action.  To the extent that the Company failed to comply with these legal requirements, the Reorganization was ineffective and subject to rescission by this Court.

**SUMMARY OF FACTS**

**<u>Plaintiff</u>**

Plaintiff Larry Morrison is a shareholder of TBI which is the successor issuer of Men's Wearhouse pursuant to Rule 414.  Amended Complaint ("AC") ¶¶2, 3(c).  Plaintiff made a demand (the "Demand") on the Company, as required by Section 16(b), to bring an action to recover short-swing insider trading profits earned by Eminence.  AC ¶¶35, 38.  Plaintiff filed this action after the Company and Tailored Brands declined to do so.  AC ¶¶42, 44, 45.

**Men's Wearhouse, Tailored Brands and the Reorganization**

The Company's common stock was registered with the SEC pursuant to Section 12 of the Exchange Act and publicly traded on the New York Stock Exchange ("NYSE").  AC ¶3(a).  In June 2014, Men's Wearhouse acquired JOSB, a former competitor in the sale of men's apparel.  *See* The Men's Wearhouse, Inc., Amendment No. 18 to Schedule TO (Jun. 18, 2014) (Exhibit F to Decl. of Michael E. Swartz (ECF No. 16)).

On January 31, 2016 -- or more than 19 months after Men's Wearhouse completed its acquisition of JOSB -- the Company completed the Reorganization through which TBI became the parent holding company of Men's Wearhouse.  AC ¶3(b).  The Reorganization was accomplished by Tailored Brands, which did not own any assets and had been formed as a wholly-owned subsidiary of Men's Wearhouse, merging with and causing the Company to become TBI's wholly-owned subsidiary.  *See* Tailored Brands, Inc., Current Report (Form 8-K) (Feb. 1, 2016) (Swartz Decl. Ex. G).  The Reorganization, from the standpoint of Plaintiff and other shareholders, was a mere formality as it did not affect any of their rights as shareholders and did not even involve issuing new stock certificates.  AC ¶¶3(b), 3(c).

The Reorganization purportedly complied with the requirements of Rule 414.  *See* AC ¶3(c).  As a result, TBI was designated as a successor issuer of Men's Wearhouse and did not need to file a new registration statement with the SEC.  AC ¶3(c).  As a successor issuer, TBI owns the Section 16(b) claim against Eminence previously owned by Men's Wearhouse.  *Id.*

In the Board's haste to complete the Reorganization, however, it failed to obtain the shareholder approval required by Rule 414(c).  AC ¶3(d).  This, together with the Reorganization

coming right before Plaintiff would have been able to file this action, demonstrates that the timing was driven by a desire to enable Eminence to avoid Section 16(b) liability. *Id.*

**Eminence**

Defendant Eminence Capital, LLC, as succeeded by Eminence Capital, L.P. ("Eminence Capital"), was and is an investment manager which purchases and sells securities on behalf of clients. AC ¶4. Defendant Eminence GP, LLC ("Eminence GP") serves as a general partner or manager for the following investment funds: Eminence Partners, L.P.; Eminence Partners II, L.P.; Eminence Partners Leveraged, L.P.; Eminence Eaglewood Master, L.P.; Eminence Partners Long, L.P.; Eminence Fund Long, Ltd.; Eminence Fund Master, Ltd.; Eminence Fund Leveraged Master, Ltd.; and John Doe, which is a separately managed account. AC ¶¶5, 7. Defendant Ricky Sandler serves as the Chief Executive Officer of Eminence Capital and as the Managing Member of defendant Eminence GP. AC ¶6.

**Eminence Successfully Pushes for a Merger Between the Company and JOSB**

In October 2013, the Board rejected an offer made by JOSB to acquire Men's Wearhouse. AC ¶¶10-11. Eminence, which held a large equity position in Men's Wearhouse, publicly pressured the Board to proceed with the merger. AC ¶12. To that end, Eminence filed with the SEC preliminary proxy solicitations for bylaw amendments allowing the Company's shareholders to remove members of the Board without cause. AC ¶¶14-16.

On November 26, 2013, in response to Eminence's pressure on the Board, Men's Wearhouse made a tender offer to acquire JOSB for $55 per share. AC ¶18. After, JOSB rejected that offer, the Company increased its offer to $57.50 per share (AC ¶20) and Eminence began pressuring that company's board of directors to accept the Company's offer through filing an action for breach of fiduciary duty in Delaware Chancery Court (AC ¶¶21-22).

On February 24, 2014, the Company announced an increase in the tender offer price for JOSB to $63.50 per share and was willing to increase it further to $65.00 per share. AC ¶23. JOSB accepted the offer, causing Eminence to voluntarily dismiss the complaint it had previously filed against JOSB's board of directors. AC ¶27. On June 18, 2014, the Company completed its acquisition of JOSB for $65.00 per share. Swartz Decl. Ex. F. Eminence profited from the acquisition's completion based upon its status as a large shareholder of JOSB. *See, e.g.*, M. Farrell, *Activist Hedge Fund Criticizes Jos. A. Bank for Eddie Bauer Deal*, WALL ST. J. L. BLOG (Feb. 18, 2014) (Eminence owned 4.9% of JOSB's common stock) (Exhibit A to the Declaration of Jeffrey S. Abraham ("Abraham Decl. Ex. []")).

**Eminence Becomes a 10% Beneficial Owner of Men's
Wearhouse Common Stock Through Open Market Purchases**

On December 18, 2014, Eminence reported in an SEC filing that, on December 16, 2014, it had purchased a total of 1,125,000 shares of Men's Wearhouse stock for $41.88 per share, causing Eminence to become a beneficial owner of 11.8% of the Company's outstanding shares of common stock. AC ¶29. However, a review of that day's trading data demonstrates that there had been no single open market transaction for 1,125,000 shares of Men's Wearhouse stock. AC ¶30; Abraham Decl. ¶3 and Ex. B. Instead, the reported transaction for those shares aggregates many smaller trades which Eminence engaged in either directly or through an agent. AC ¶30.

**Eminence Also Becomes a 10% Beneficial Owner of Men's Wearhouse
Common Stock Through Its Membership in a Group with Board Members**

The Company increased the price it was willing to pay for JOSB pursuant to the terms of a standstill agreement (the "Standstill Agreement") which Eminence entered into with the Company (AC ¶24), with both events occurring on February 24, 2014 (AC ¶¶23-24). The Standstill Agreement provided for the Company to proceed with an increased offering price to

acquire JOSB in exchange for Eminence ceasing its previously announced proxy solicitation efforts and agreeing to vote its shares of the Company's stock in accordance with the recommendation of the Board.  AC ¶25(a); Ex. D.3 (ECF No. 7-5) at p.4, ¶3.  The terms of the Standstill Agreement were effective through July 1, 2015.  AC ¶26.

This understanding with respect to the voting of the Company's common stock caused Eminence and the Board members to be part of a single group within the meaning of Section 13(d).  AC ¶25(b).  Eminence beneficially owned approximately 9.8% of the Company's common stock (AC ¶12) which, combined with the shares owned by other members of the Board, caused the group to beneficially own 10% or more of the common stock.  AC ¶26.

**Eminence Profited from Short-Swing Trading**

Eminence's purchases of the Company's common stock at a reported price of $41.88 per share (AC ¶31) occurred within six months of sales at higher prices ranging from $46.72 per share to $58.29 per share.  AC ¶32.  As a result, Eminence is estimated to have earned short-swing insider trading profits of at least $17.4 million.  AC ¶33.

## ARGUMENT

The relevant issue, in deciding a motion to dismiss pursuant to Rule 12(b)(6), is whether a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claim. *Twombly*, 550 U.S. at 556.

I.    **PLAINTIFF PLAUSIBLY ALLEGED THAT EMINENCE BENEFICIALLY OWNED 10% OR MORE OF THE COMPANY'S COMMON STOCK WHILE ENGAGING IN SHORT-SWING TRADING**

Section 16(b) is designed to prevent statutory insiders, including beneficial owners of 10% or more of a company's common stock, "from engaging in speculative transactions on the basis of information not available to others." *Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173-74 (2d Cir. 2012) (citation omitted). Section 16(b) implements this core purpose of the federal securities law by requiring statutory insiders "to disgorge all profits realized from" short-swing transactions involving the "purchase and sale (or sale and purchase) of the same security made within a six month period." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012); *see also Roth v. Jennings*, 489 F.3d 499, 516 (2d Cir. 2007). Accordingly, Section 16(b) liability exists where there was "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Feder ex rel. Ivax Corp. v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000).

Here, Eminence does not, nor could it reasonably, dispute that Plaintiff plausibly alleged that Defendants earned short-swing profits through trading in the Company's common stock, *i.e.*, elements 1, 2 and 4 of the claim. Instead, Defendants contend that Plaintiff has not plausibly alleged that Eminence was a beneficial owner of 10% or more of common stock during the times it unquestionably engaged in short-swing insider trading. However, Defendants are in error because Plaintiff has plausibly alleged that Eminence had become a 10% beneficial owner both individually and as a member of a group.

### A. Plaintiff Plausibly Alleged that Eminence Beneficially Owned 10% or More of the Common Stock

Section 16(b) does not define the term "beneficial owner."  Instead, the SEC has filled the gap by defining "beneficial owner" as "any person who is deemed a beneficial owner pursuant to section 13(d) of the [Exchange] Act and the rules thereunder."  SEC Rule 16a-1(a), 17 C.F.R. § 240.16a-1(a)(1) (2016).  *See generally Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 118, 122 (2d Cir. 2001).  Rule 13d-3(b) prevents evasion of the rules governing the beneficial ownership of securities by providing that:

> Any person who, directly or indirectly, creates or uses . . . any . . . contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) . . . of the [Exchange] Act shall be deemed for purposes of such sections to be the beneficial owner of such security.

17 C.F.R. § 240.13d-3(b) (2016); *see, e.g., SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993).  Thus, the Second Circuit held that a shareholder (Bilzerian) could not avoid becoming a beneficial owner of stock which he accumulated or held through brokerage firm nominees.  *U.S. v. Bilzerian*, 926 F.2d 1285, 1289-90 (2d Cir. 1991) (upholding criminal conviction based on misrepresentations in a Schedule 13D filing where a brokerage firm was holding securities for the defendant's benefit).  *See also SEC v. Bilzerian*, 29 F.3d 689, 693 (D.C. Cir. 1994) (upholding civil liability for, among other things, Bilzerian's "accumulation agreements serv[ing] the purpose of concealing his beneficial ownership of the stock.")[1]

---

[1]   The SEC, in a litigation release, described a violation of the reporting requirements of Section 13(d) as "allege[ing] that the Schedule 13D was filed by Bilzerian four days late as a result of a secret accumulation arrangement that Bilzerian had entered into with an employee of Jefferies & Company ("Jefferies"). Pursuant to this arrangement, Jefferies acquired and held Cluett stock for Bilzerian's benefit in a firm account."  *Bilzerian*, Exchange Act Release No. 12144, 1989 SEC LEXIS 1208, at *3-4 (June 29, 1989).

Here, Plaintiff alleges that Eminence's reported December 16, 2014 purchase of 1,125,000 shares of common stock, in fact, represented an aggregation of many smaller trades which Eminence engaged in directly or through an agent.  AC ¶30.  Plaintiff's allegation is based upon the Bloomberg service reporting of NYSE trading in Men's Wearhouse common stock on December 16, 2014, not mentioning any trade of 1,125,000 shares at $41.88 per share.  *Id*.; *see also* Abraham Decl. ¶3 and Ex. B.

Defendants do not, nor could they reasonably, deny that the purported single block trade was not reported as having taken place on the NYSE.  Instead, Eminence seeks to argue the facts by referencing a purported copy of the consolidated tape which includes transactions that did not take place on the open market.  Defs. Mem. (ECF No. 15) at 18.  However, it is inappropriate to argue the facts or decide disputed factual issues on a Rule 12(b)(6) motion to dismiss; instead, facts must be accepted as true.  *See, e.g.*, *Iqbal*, 556 U.S. at 678.

Moreover, Defendants have failed to properly authenticate the document which supports their factual contention, making its contents inadmissible.  *See, e.g.*, Fed. R. Evid. 902(11).  However, even if Eminence had properly authenticated the document, the use of the consolidated summary of composite NYSE trading is inadmissible where the actual trading records are in Defendants' possession, because there is no evidence that the actual transaction records relating to the purported trade at issue could not have been produced.  *See* Fed. R. Evid. 1006.  Indeed, Eminence declined Plaintiff's specific request to provide a copy of the relevant transaction documents necessary to support Defendants' factual contention that there was a single 1,125,000

share open market trade rather than an aggregation of smaller trades or transactions conducted through an agent. *See* AC Ex. G at p.1.[2]

Finally, even assuming admissibility of that document, the trade in the report upon which Defendants rely is identified as "ADF.TB" referring to an Alternative Display Facility. According to the Financial Industry Regulatory Authority (FINRA), an ADF is a "display only facility" (http://www.finra.org/industry/adf) and *not* the open market trade referred to in the Schedule 13D filed by Eminence. *See* AC Ex. D at p.2. The use of the ADF, therefore, makes it highly likely that an agent acting on behalf of Eminence accumulated the 1,125,000 shares through a series of smaller trades effectuated on the NYSE, consistent with the open market trades described in the Schedule 13D filed by Defendants. *See* AC ¶29.

### B. Plaintiff Plausibly Alleged that Eminence Was a Member of a Section 13(d) Group Beneficially Owning 10% or More of the Common Stock

SEC Rule 13d-5(b)(1), promulgated by the SEC under Section 13(d) of the Exchange Act, applies in determining whether a person is a 10% or more beneficial owner of common stock. *See, e.g., Quintel Entm't,* 249 F.3d 115 at 123-24. Rule 13d-5(b)(1) provides that "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, ***voting*** or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of [S]ection[] 13(d) . . . , as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such person." 17 C.F.R. § 240.13d-5(b)(1) (2016) (emphasis added). Thus, a person who is a member of a group is deemed to be the beneficial owner of all the issuer's securities owned by the other group members. *E.g., Roth,* 489 F.3d at 508 (citing 15 U.S.C. § 78m(d)(3) and 17 C.F.R. § 240.13d-

---

[2]     The actions of an agent acting on behalf of Eminence, absent adverse interests, are attributable to Defendants. *See, e.g., Republic of Iraq v. ABB AG,* 768 F.3d 145, 166 (2d Cir. 2014) (citing *In re Bennett Funding Grp., Inc.,* 336 F.3d 94, 100 (2d Cir. 2003)).

5(b)(1)).  Accordingly, a person individually owning less than 10% of an issuer's stock can still be subject to Section 16(b) liability based upon ownership interests of other members of a group. *E.g., Roth*, 489 F.3d at 507.

There are two elements for forming a Section 13(d) group: (1) "the members combined in furtherance of a common objective;" and (2) one of the common objectives must involve the acquisition, holding, voting *or* disposition of an issuer's equity securities.  *Roth*, 489 F.3d at 507-08 (citing cases).  Any one of the purposes enumerated in SEC Rule 13d-5(b)(1), notably here that of voting the equity securities at issue, standing alone, is sufficient to support the existence of a Section 13(d) group.  *See, e.g.*, *Roth*, 489 F.3d at 508 (quoting *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) (requiring "that the members combined in furtherance of *a* common objective") (emphasis added)).

### 1. Plaintiff Has Plausibly Alleged that Eminence Combined in Furtherance of a Common Objective with Members of the Board

Defendants contend that they could not possibly have combined with the Board members to form a Section 13(d) group because: the Board members were not parties to the Standstill Agreement which was only entered into between Eminence and the Company; Eminence was not part of a group but, instead, only required to follow the Board's instructions; individual Board members could theoretically refuse to follow the Board's recommendations; and public policy concerns militate against the finding of a Section 13(d) group and related Section 16(b) liability. Defs. Mem. at 23-25.  Each of Defendants' arguments lacks merit.

As an initial matter, the combination necessary to form a Section 13(d) group does not require the existence of a formally binding written agreement.  Instead, the arrangement giving rise to a Section 13(d) group does not need to be formal, with an informal arrangement sufficing, and "whether such an agreement exists [being] a question of fact."  *E.g., Dreiling v. Am. Online,*

*Inc.*, 578 F.3d 995, 1002-03 (9th Cir. 2009) (citing cases).  Accordingly, an agreement forming a Section 13(d) group does not need to be in writing and that circumstantial evidence suffices in order to find that a group exists.  *E.g., Wellman*, 682 F.2d at 363.  "A contrary interpretation would exalt form over substance, as group disclosure . . . would then hinge on the degree of formality of the arrangement."  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1163 (D.C. Cir. 1978) (citing cases), *overruled on other grounds by Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004).

Thus, there is no requirement that the Board members be parties to a formal written contract.  This is particularly true where, as here, the arrangement is consistent with the allowing for the mutual profit of Eminence, on the one hand, and the Company's senior executives and Board members, on the other hand.  Specifically, Eminence profited through the increased price it received for selling its 4.9% stake in JOSB to the Company in the tender offer.  *See, e.g.*, AC ¶¶21-22; Abraham Decl. Ex. A.  The Board members profited through retaining their positions as members of the Board for which they received $350,000 or more in annual compensation.  *See* The Men's Wearhouse Inc., 2015 Proxy Statement (Schedule 14A) (May 19, 2015) at p.10 (the "Proxy"); Abraham Decl. Ex. C (excerpted pages).[3]  Douglas S. Ewert, who was the Chairman of the Board and the CEO of Men's Wearhouse, also profited through subsequent changes to the Company's compensation plans.  *See id.* at "Notice of Annual Meeting of Shareholders"; *id.* at pp.37-38.

The potential problem with this arrangement of mutual convenience was that Eminence received all its benefits up front from the increased price paid for JOSB stock while those of the Board members, especially Ewert, were delayed until the next annual meeting or could be taken

---

[3]      This does not include two of the directors who did not stand for re-election at the 2014 annual meeting and thus earned less in 2015.

away through a proxy fight to oust the Board.  The voting agreement bridged this gap and

allowed the two respective interest groups to unite in a necessary common objective to vote as a

group in the manner recommended by the Board so that they could both profit.

In addition, under Texas law, under which Men's Wearhouse was incorporated, the

Company could only have entered into the Standstill Agreement, if it were approved by the

Board members.  *See* Tex. Bus. Orgs. Code § 21.401 (2016).  Thus, it is apparent that the Board

members were, in fact, directly involved in forming an arrangement with Eminence even though

they were not formal parties to the written contract.  *See, e.g., Wellman, supra.*

Also infirm is Defendants' contention that they were not part of a Section 13(d) group but

were, instead, required to follow the directions of the Board members.  Defs. Mem. at 24.

However, control over the arrangement creating a Section 13(d) group is not necessary in order

to form a common objective.  Instead, the precise person controlling the group activity is

irrelevant especially where, as here, Defendants voluntarily entered into an arrangement through

which they would vote their common stock as a member of a group with the Board members.

*Quintel Entm't* is on point as it involved a case in which individual shareholders were

contractually bound through a lock-up and other ancillary agreements to follow the dictates of

the company in holding their stock for a set period of time.  249 F.3d at 119-20.  The agreement

was entered into at the insistence of the company which had control over whether to release the

shareholders from the lock-up agreement.  *Id.*  Nonetheless, the Second Circuit held that, because

the shareholders voluntarily entered into the agreement, they were then members of a Section

13(d) group.  *Id.* at 127.

*Facebook, Inc. v. Morgan Stanley & Co. LLC*, 986 F. Supp. 2d 544 (S.D.N.Y. 2014),

upon which Defendants rely, is not on point because the Section 13(d) group was alleged to have

13

been formed through an underwriting agreement which the court found to be a structural necessity of engaging in underwriting. *Id.* at 552-53.[4] Here, in contrast, the Standstill Agreement, together with the related understandings and arrangements, was not necessary or structural to the trading of the Company's securities or any other aspect of its business.

Nor do Defendants fare any better with the illogical contention that a Section 13(d) group could not have existed because the individual Board members were not required to vote in accordance with the Board's recommendations concerning the election of the individual directors. *See* Defs. Mem. at 24; *see also* AC Ex. G (discussing issue). This ignores that any Board recommendation, by its very nature, could have only come about by the vote of the majority, if not all, of the individual Board members. At the same time, Defendants' contention improperly elevates the form over the substance of the arrangement which unquestionably reflects an understanding for Eminence and the Board members to vote together *in the future*. Defendants' questionable hypothesis of errant Board members cannot defeat the plausible inference, if not near certainty, that a group was formed especially where, as here, there is no evidence of such an errant Board member ever having existed.[5]

Implicitly recognizing the infirmity of their legal arguments, Defendants seek to invoke public policy concerns by claiming that extending liability to them would inhibit shareholders from entering into voting agreements with board members. Defs. Mem. at 25. This argument

---

[4]     *Facebook* is also the subject of a pending appeal before the U.S. Court of Appeals for the Second Circuit. *See In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, No. 14-3800 (2d Cir.)

[5]     In the unlikely event that did occur that there were errant Board members -- and there is no evidence that anything like that happened --, Eminence, which beneficially owned 9.8% of the Company's stock, was so close to the 10% beneficial ownership threshold that almost any individual, and certainly a majority of, the Board would have taken Defendants over 10%. *See* Proxy (Abraham Decl. Ex. C) at p.83 (The Company's directors beneficially owned, in aggregate, 1.2% of its outstanding shares, of which Ewert held 288,403 shares.)

lacks merit because Defendants fail to explain the precise public policy advanced by voting

agreements or how they would be impeded by properly applying the statutory provisions for

imposing Section 16(b) liability.  Instead, all Section 16(b) does, as relevant here, is prevent

shareholders, who achieve 10% beneficial ownership through entry into a voting arrangement,

from engaging in short-swing insider trading, which is prohibited for all statutory insiders.  *See*

15 U.S.C. § 78p(b) (directors, officers and more than 10% beneficial owners are subject to

Section 16(b) liability).

Moreover, Defendants neglect that Section 16(b) embodies a public policy objective as

part of the Exchange Act, which seeks to regulate transactions on the national securities

exchanges "in order to protect interstate commerce, the national credit . . . and to insure the

maintenance of fair and honest markets in such transactions."  15 U.S.C. § 78b (2016).  Aside

from those general public policy concerns, Section 16(b) embodies a significant public policy

concern by acting as "a prophylactic measure designed to deter insider short-swing trading."

*Feder*, 220 F.3d at 36.  These policy concerns are also present where shareholders act "in

combination with others."  *Roth*, 489 F.3d at 507 (citing 15 U.S.C. § 78m(d)(3)); *see also*

*Goldstein v. QVT Assocs. GP LC*, No. 10 Civ. 2488 (HB), 2010 U.S. Dist. LEXIS 109973, at *11

(S.D.N.Y. Oct. 15, 2010).  These are significant and objective public policy concerns which

cannot yield to Defendants' amorphous "policy" concerns tailored to their objective of avoiding

liability for short-swing insider trading profits.

### 2. Plaintiff Has Plausibly Alleged that One of the Common Objectives of the Group Related to the Voting of the Company's Common Stock

Defendants contend that there could not have been a Section 13(d) group because

Eminence and the Board actually had opposing objectives which were settled through the

Standstill Agreement.  Defs. Mem. at 25.  This argument does not make any sense because the

Section 13(d) group is only alleged to have come into existence at the time Eminence and the

Board achieved an agreement with respect to several issues.

　　As discussed above, Eminence and the Board members had a common profit objective:

an increased price for the JOSB shares owned by Eminence and the voting of Men's Wearhouse

securities in favor of the Board members and in favor of increased compensation for Ewert.

Although Eminence did not have a direct interest in the Board members' compensation, it

assumed that interest in order to facilitate its profiting from the successful completion of the

Company's tender offer for the shares of JOSB and the profit Eminence earned thereby.

　　Moreover, even assuming *arguendo* that Eminence had certain different objectives from

the members of the Board, it would not matter because it is well-settled that "parties can agree to

act in furtherance of some common objective even though 'the parties might not always march in

lockstep . . . .'" *Schaffer, ex rel. Lasersight Inc. v. CC Invs., LDC*, No. 99 Civ. 2821 (VM), 2002

U.S. Dist. LEXIS 24511, at *14 (S.D.N.Y. Dec. 19, 2002) (quoting *Morales v. New Valley

Corp.*, 999 F. Supp. 470, 475-76 (S.D.N.Y. 1998), *aff'd sub nom. Morales v. Freund*, 163 F.3d

763 (2d Cir. 1999)).  Thus, in *New Valley*, which was affirmed by the Second Circuit, the court

*rejected* the defendants' argument that no group had been formed because the defendants bought

some of their shares from some of the other group members.  999 F. Supp. at 475 n.5.  *See also

Roth,* 489 F.3d at 515-16 (Section 13(d) group exists even where the first group member wished

to assume control of the issuer while the second group member, as evidenced by his conduct,

wished to make money from trading the stock).

　　*Sisak v. Wings & Wheels Express, Inc.*, 70 Civ. 2817, 1970 U.S. Dist. LEXIS 10313

(S.D.N.Y. Sep. 9 1970), upon which Defendants rely, is not on point.  In *Sisak*, the putative

group consisted of two parties, with the sum total of their purported group activity being that

they were on the opposite sides of a transaction with one selling all its stock to the other person. *Id.* at *15. Thus, the court held that "the notion of a group does not comfortably embrace both buyer and seller . . . at least where the sole aspect of the transaction is to sell all of the securities of one party to another." *Id.* at *16. *Cf. New Valley, supra* (finding Section 13(d) group formed for a common objective despite one member selling stock to another member of the group).

Here, in contrast, Eminence was not on the opposite side of any transaction with the members of the Board. Instead, they were united in a common objective of both acquiring JOSB and voting in favor of the Board and any of its proposals at future shareholder meetings of the Company. That is a sufficient basis under controlling Second Circuit authority to find, and from which to plausibly allege, the existence of a Section 13(d) group.

## II.   PLAINTIFF HAS STANDING TO ASSERT THE SECTION 16(b) CLAIMS ASSERTED IN THIS ACTION

Defendants contend that Plaintiff lacks standing to pursue a Section 16(b) claim because Men's Wearhouse is the "issuer" on whose behalf the claim must be asserted and the Reorganization caused Plaintiff to become a shareholder of TBI, which is the Company's only remaining shareholder. Defendants, however, are in error because: (a) TBI being a successor issuer of Men's Wearhouse allows Plaintiff to pursue this action; (b) Rule 414 requires TBI to obtain ownership of the rights and pursue Section 16(b) claims; and (c) in the alternative, this Court should disregard the Reorganization because of the failure to comply with Rule 414.

### A. Plaintiff Has Standing to Pursue Section 16(b) Claims Because TBI Is a Successor Issuer to Men's Wearhouse

Defendants do not, nor could they, reasonably dispute that Plaintiff retains standing to sue under Section 16(b) if TBI is, in fact, a successor issuer of Men's Wearhouse. This rule of law was established fifty years ago in *Blau v. Oppenheim,* 250 F. Supp. 881 (S.D.N.Y. 1966).[6]

*Untermeyer v. Valhi*, *Inc.,* 665 F. Supp. 297 (S.D.N.Y. 1987), *aff'd,* 841 F.2d 25 (2d Cir. 1988), upon which Defendants rely, acknowledges that where "the parent corporation was in a real sense the successor of the defunct issuer", a shareholder owning stock in the parent corporation continues to have standing to pursue a Section 16(b) claim. *Id*. at 300. In *Untermeyer*, the parent company was not a successor issuer because:

> [T]he transaction took place without a similar exchange of securities; the parent's stock was not exchanged for stock of the issuer. Stock of the issuer was exchanged for cash. Thus, there would be no reason to consider CSX as the successor issuer of Sea-Land.

*Id.* at 300-01 (emphasis added). Indeed, in ruling on the appeal, the Second Circuit unequivocally stated that *Blau* has never been overruled. *Untermeyer*, 841 F.2d at 25-26 ("[N]owhere did the district court suggest that its decision overrules *Blau*. Likewise, nothing in our affirmance of the district court's decision here is intended to alter the decision in *Blau*.").

The Second Circuit also subsequently rejected an effort to limit the holding in *Blau* to those situations in which the issuer (such as Men's Wearhouse) did not survive the merger. Instead, the Second Circuit held that, consistent with *Blau*, a shareholder of a successor issuer continued to have standing to sue under Section 16(b) even where the original issuer became a

---

[6]    In *Blau,* the issuer was merged into the wholly owned subsidiary of a publicly held corporation in a transaction in which shares of the parent of the subsidiary were exchanged for shares of the issuer, causing all shareholders of the issuer to become shareholders of the parent. 250 F. Supp. at 883. As a shareholder of the parent corporation, the plaintiff sued under Section 16(b) to recover short-swing profits. *Id. Blau* held that the parent corporation was the successor of the issuer and should be treated as the "issuer" for purposes of section 16(b). *Id.* at 886-88.

wholly-owned subsidiary of a parent company. *Mendell ex. rel. Viacom, Inc. v. Gollust,* 909 F.2d 724, 729 (2d Cir. 1990), *aff'd on other grounds,* 561 U.S. 115 (1991).

Here, TBI is unquestionably the successor issuer for Men's Wearhouse: it has the exact same stockholders, having the exact same rights, and relies on the exact same registration statements filed with the SEC by Men's Wearhouse. AC¶3(b), (c). In addition, TBI is a successor issuer *as a matter of law* under Rule 414, a status which allowed it to rely on all prior filings made by Men's Wearhouse with the SEC.

*Gollust v. Mendell*, 501 U.S. 115 (1991), upon which Defendants rely, did not address the issue of whether a shareholder of a successor issuer had standing to sue under Section 16(b), leaving prior Second Circuit law firmly in place. Instead, *Gollust* only held that a shareholder properly instituting a Section 16(b) action did not need to remain a shareholder of the issuer in order to continue to have standing. *Id.* at 118, 124. Thus, "*Gollust* does not overrule *Untermeyer* either expressly or impliedly." *Heine ex rel. Computer Assocs Int'l, Inc. v. Soros*, No. 93 Civ. 9027 (LMM), 1994 U.S. Dist. LEXIS 15812 at *4 (S.D.N.Y. Nov. 3, 1994).

Indeed, rather than relying on the holding in *Gollust*, Defendants focus on a single line of *dicta* paraphrasing the definition of "issuer" in Section 3(a)(8) of the Exchange Act, 15 U.S.C. § 78c(a)(8) (2016), as the company that actually issued the securities. Defs. Mem. at 10 (quoting *Gollust*, 501 U.S. at 123). However, that *dicta* is not controlling. *See, e.g.*, *Tze Wung Consultants, Ltd. v. Bank of Aroda (In re Indu Craft, Inc.)*, 749 F.3d 107, 116 n.12 (2d Cir. 2014) (citing cases). More importantly, TBI is the entity that "actually issued the security" based upon its status as a successor issuer which, among other things, causes "the registration statement of the predecessor issuer [to] be deemed the registration statement of the successor issuer . . . ." 17 C.F.R. § 230.414.

In *Gollust*, in contrast, the new corporate parent was not a successor issuer of the prior company.  Specifically, Arsenal Holdings, the surviving public company, acquired Viacom International, Inc., which had been the issuer, for cash and stock.  501 U.S. at 118-19.  *Gollust* did not involve, as is the case here, a technical change in the form of corporate organization: shareholders retained their very same status and did not even have to exchange stock certificates (AC ¶3(b), (c)); and TBI was not required to file its own registration statement with the SEC but, instead, relied upon the registration statements previously filed by Men's Wearhouse.  AC ¶3(c).

*Heine*, upon which Defendants also seek to rely, is similarly inapposite to the case at bar because, like *Untermeyer* and *Gollust*, it involved a "cash-out merger" in which the shareholders received cash rather than stock in exchange for shares of the issuer.  1994 U.S. Dist. LEXIS 15812, at *1.  Here, in contrast, Men's Wearhouse shares were exchanged on a one-for-one basis without any change in their rights or preferences, without the need to get new stock certificates and without TBI having to file a new registration statement with the SEC.

**B.  Rule 414(b) Required TBI to Assume Ownership of the Section 16(b) Claim**

Rule 414(b) requires that TBI assume the assets previously owned by Men's Wearhouse.  *See* 17 C.F.R. § 230.414(b) (2016).  These assets include the Section 16(b) claim which is the subject of this action (AC ¶3(c)) and the proceeds of which would have inured to its benefit.  *See, e.g., iXL Enters. v. GE Capital Corp.*, 167 F. App'x. 824, 826 (2d Cir. 2006) (a Section 16(b) action is a corporate asset) (citing *Pepper v. Litton*, 308 U.S. 295, 306-07(1939)).[7]  Therefore,

---

[7]     Even principles of agency deference do not allow the SEC to ignore the plain meaning of its own rules or engage in a re-writing of their provisions.  *See, e.g., Christensen v. Harris Cnty*, 529 U.S. 576, 588 (2000) (rejecting an agency's interpretation of its own regulation for being contrary to the plain meaning of the regulation).

applying the plain meaning of Rule 414(b), TBI was required to directly acquire that asset from Men's Wearhouse before the Reorganization could be effective under Rule 414.

Defendants, in an argument confined to a footnote, contend that the Reorganization satisfies the requirements of Rule 414 because TBI, indirectly through Men's Wearhouse, continues to indirectly own the Section 16(b) claim.  *See* Defs. Mem., at 14 n.8 (citing *Monster Beverage Corp. & New Laser Corp.*, SEC No-Action Letter, 2015 SEC No-Act. LEXIS 377 (June 12, 2015)).  However, even *Monster Beverage* -- the only authority upon which Defendants rely -- acknowledges that indirectly acquiring the assets does *not* comply with Rule 414(b)'s requirements.  *Id.* at *44.

*Monster Beverage* is also not on point because, in that proceeding, the petitioner's request for relief was premised on the fact that the "rights of the shareholders are not changed by or as a result of [the] reorganization."  *Id.* at *9.[8]  In *Monster Beverage*, the reorganization was effected pursuant to Section 251(g) of the Delaware General Corporation Law (*id.* at *6) requiring that any reorganization *not* deprive a stockholder such as Plaintiff from having standing to pursue a derivative complaint.  *See* 8 *Del. C.* § 251(g) (2016).  Texas law, in contrast, contains no such requirement.  *See* Tex. Bus. Orgs. Code § 10.005 (2016).

Thus, the failure to provide for Tailored Brands assuming the ownership of the Section 16(b) claims would affect the substantive rights of Plaintiff and other Men's Wearhouse shareholders.  This is a critical distinction which makes *Monster Beverage* inapposite to the case at bar.  Accordingly, in order to comply with Rule 414(b), Tailored Brands was required to assume ownership of the Section 16(b) claims.

---

[8]     The SEC's decision in *Monster Beverage* not to take any enforcement action is based upon the unique facts of that case and, as the SEC explicitly stated, "[d]ifferent facts or conditions might require different conclusions."  2015 SEC No-Act. LEXIS 377, at *2.

Finally, *Monster Beverage* is not controlling because it is well settled that SEC no-action letters are not official expressions of the SEC's views and, therefore, do not have the force of law. *See, e.g., N.Y.C. Emples. Ret. Sys. v. SEC*, 45 F.3d 7, 12-13 (2d Cir. 1995) (discussing nature and effects of no-action letters). Indeed, in granting the request for no action, the SEC lawyer specifically stated that: "Our positions are based on the representations made to the Division in your letter. Different facts or conditions might require different conclusions." *Monster Beverage*, 2015 SEC No-Act. LEXIS 377, at *2.

### C. The Reorganization Can Also Be Disregarded for Purposes of This Action Because of TBI's Failure to Comply with Rule 414

Separate and aside from Defendants' contention that the Reorganization having violated Rule 414(b), the Reorganization was unquestionably accomplished in violation of Rule 414(c). Specifically, Rule 414(c) requires that "[t]he succession was ***approved by security holders*** . . . at a meeting for which proxies were solicited pursuant to section 14(a) of the . . . Exchange Act . . . or information was furnished to security holders pursuant to section 14(c) of the . . . Exchange Act . . . ." 17 C.F.R. § 230.414(c) (emphasis added).

Defendants, nonetheless, contend the Company was not required to obtain shareholder approval because no such approval was required under Texas state law. Defs. Mem. at 14 & n.8 (citing *Monster Beverage, supra*). Defendants' argument lacks merit because it is the language of Rule 414(c) which is controlling, rather than the contents of a no-action letter which is not controlling. *See, e.g., N.Y.C. Emples. Ret. Sys.*, *supra*.

Moreover, *Monster Beverage* is not on point because, there, any shareholder vote was "not material" given that shareholder rights were not affected by the reorganization. 2015 SEC No-Act. LEXIS 377, at *9, *45. However, as discussed above, here the right to maintain the Section 16(b) action would have been potentially affected by Texas law which differs from

Delaware law in the context of corporate reorganizations. *See* Point II.B., *supra.* Accordingly,

any decision whether to proceed with the Reorganization was material to the Company's

shareholders and, therefore, required a shareholder vote pursuant to Rule 414(c).

To the extent TBI failed to comply with the requirements of Rule 414, it was not a

successor issuer of Men's Wearhouse. This, in turn, caused the issuance of TBI stock to have

taken place without an effective registration statement being filed with the SEC, which violates

Section 5 of the Securities Act. *See* 15 U.S.C. § 77e(a) (2016). As a result, Plaintiff is entitled to

have the transaction rescinded pursuant to Section 12(a)(1) of the Securities Act. *See* 15 U.S.C.

§ 77l(a) (2016) (allowing a person "to recover the consideration paid for such security"); *see also*

*Pinter v. Dahl,* 486 U.S. 622 (1988).[9]

### III.   ALLEGATIONS CONCERNING THE REORGANIZATION'S TIMING BEING FRAUDULENTLY MOTIVATED BY EMINENCE'S DESIRE TO AVOID SECTION 16(b) LIABILITY SHOULD NOT BE STRICKEN

Defendants contend that Plaintiff's allegation that the Reorganization was fraudulently

motivated by a desire to insulate Eminence from Section 16(b) liability should be stricken from

the Complaint as entirely baseless. Defs. Mem. at 15. Specifically, Defendants point to a press

release, announcing the Reorganization issued two days before the Demand was made on the

Board, as conclusively demonstrating that TBI did not engage in the Reorganization in an

(unsuccessful) attempt to deprive Plaintiff of standing to pursue Section 16(b) claims. *Id.* at 13.

---

[9]     Plaintiff did not plead a claim for relief under Section 12(a)(1) but he is not required to do so because, under principles of notice pleading, he was only required to plead the relevant facts supporting any necessary claim. *See, e.g.*, *Johnson v. City of Shelby*, No. 13-1318, 2014 U.S. LEXIS 7437, at *1 (Nov. 10, 2014) (per curiam). Nonetheless, Plaintiff stands ready and able to amend his complaint in order to include such a claim if the Court believes it is necessary. Such leave to amend should be freely given when justice so requires. *See* Fed. R. Civ. P. 15(a)(2); *see also Williams v. Citigroup, Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (finding denial of leave to amend was abuse of discretion, even where such leave had been sought only after entry of dismissal judgment) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Defendants, however, ignore that it is the *timing* of the Reorganization which was intended to deprive Plaintiff of standing.  Plaintiff made the Demand on December 11, 2015, making him free to institute his action 60 days later or by February 9, 2016 if the Company or the Board declined to institute the action.  *See* 15 U.S.C. § 78p(b) (2016).  Had the Company followed the procedures required by Rule 414 of obtaining shareholder approval, the Reorganization could not have been effected prior to that date because the Company had not obtained a shareholder vote approving the Reorganization as required by Rule 414(c).  TBI, the successor issuer to the Company, issued a proxy statement on May 5, 2016 for its annual meeting to be held on June 16, 2016.  *See* The Men's Wearhouse Inc., 2016 Proxy Statement (Schedule 14A) (May 5, 2016); Abraham Decl. Ex. D (excerpted pages).  That would have been the logical time and forum for soliciting shareholder approval for the Reorganization.

There is no evidence that the Company or its shareholders would have suffered while waiting the extra few months for such approval.  Similarly, Defendants fail to advance a plausible -- or any -- explanation why the Reorganization was so pressing that the Company could not have waited to implement the Reorganization until after a proxy solicitation as unequivocally required by Rule 414.

In addition, Defendants fail to offer any explanation for the Company's rejection of the Demand coming on January 29, 2016, or only three days after the Reorganization which occurred on January 26, 2016.  *See* AC ¶¶3(d), 37.  Had the Company rejected the Demand earlier, Plaintiff could have commenced this action without encountering Defendants' effort to have this action dismissed on standing grounds.

These actions are particularly suspect in light of the Company's slavish devotion to Eminence's legal analysis.  This extends to joining in Defendants' motion to dismiss (*see* ECF.

No. 21) even though this action, if successful, will allow TBI to recover more than $17 million from Eminence.  *See* AC ¶1.

## CONCLUSION

Therefore, for all the reasons set forth above, Defendants' motion should be denied and, instead, this action should proceed with discovery towards a resolution on the merits.

Dated:  July 29, 2016

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

By:  /s/ Jeffrey S. Abraham
Jeffrey S. Abraham
One Penn Plaza, Suite 2805
New York, New York 10119
Tel.:  (212) 279-5050
Fax:  (212) 279-3655

**Counsel for Plaintiff Larry Morrison**